Dr. Raghuram G. Rajan, Deputy Head, Center for Corrections and Treatment of Asperger's Disease, is a registered Physician in the U.S. Department of Health and Human Services.  Good morning, Your Honors. I'm Deputy Attorney General Gregory Walston on behalf of the defendants and appellants, and I'd like to reserve five minutes for rebuttal. May it please the Court, to be constitutional, prison policy does not need to be perfect. It doesn't need to be necessary, and it doesn't even have to be the least restrictive means. What it does have to be is reasonable, and this is not a close scrutiny standard of review. Let me ask, is it accurate that this particular inmate couldn't receive books from publishers because of this rule? That is the allegation in the complaint, and what was presented in the motion for summary judgment were various declarations. I believe there were four from individuals who had tried to get these publications in and couldn't because of this, because this book label was not attached. So for the purposes of our review, we assume that to be the case? That would be the record. Okay. But I would like to point out, however, before I proceed, that in each of those instances, there's no evidence before this Court that there were – that those individuals repeated their attempts, in other words, brought the matter to the attention of the book vendor and tried to remedy the situation that way. That, as I say, is the record. Going back to the law, this is a rational basis test. That's what the Supreme Court essentially said in Turner. And in a case called Bell v. Woolfish, the Supreme Court held that a restriction limiting incoming publications to those sent from publishers was reasonable and therefore constitutional. You refer to Bell v. Woolfish as identical to this case. I refer to it as having an identical statutory scheme, and to be perfectly clear about that. I don't understand. Maybe I misunderstood your adjective. In your supplementary brief, I think you mentioned you referred to it as an identical. Bell v. Woolfish is identical. It isn't identical. Tell us what you meant by that. I'll tell you what I meant by that. In Bell v. Woolfish, the policy held that there was essentially what's called a publisher's only rule. This is a rule that limits incoming publications to those sent by publishers. More than that, right? It's way beyond that. It's publishers. As I recall, there were book clubs and private bookstores, and the policy morphed several times. No, no. In fact, it tells publishers how to conduct their business, doesn't it? I'm sorry? This rule tells publishers how to conduct their business. The rule in this case? Yes. Yes. I was talking about those. In that respect, it's different from Bell, isn't it? Well, it takes a further step by Bell, I agree. This is my train of thought here, because in Bell, what the Supreme Court affirmed as being constitutional was a publisher's only rule that restricted incoming prison packages to, with respect to periodicals, to those periodicals that were sent by publishers. So here we're concerned with the next step. Exactly. Mr. Asher, isn't challenging a rule which says books and other periodicals have to come from a bookstore or a publisher or whatever? That's correct. In that sense, it's not taking issue with the rule in Bell v. Woolfish? No. And it's my position that this is a reasonable step that has been taken by the prison in order to implement the publisher's only rule that was affirmed by the Court in Bell. In other words, the Bell v. Woolfish Court essentially ---- Well, the first of the ---- you say all you need to show is it's a reasonable step, but where the First Amendment is involved, don't you have to make some showing that some, you know, less restrictive alternative is not available? Especially where the evidence shows that here, as it does here, that, in effect, it ends in a ---- you know, it amounts to a total prohibition. The Supreme Court in Turner v. Daffley outlined this test. And while they did say that this was not a least restrictive means test, they did set forth several factors, the last of which was whether there are obvious easy alternatives available to a prison, to the prison, to accommodate the right. If there are, then the regulation is an exaggerated response. But they reiterated that it is not a least restrictive means test. In this case, it's my position that if this policy is effective even once in implementing the publisher's only rule, and it's just once, that keeps contraband, whether it's encrypted messages, drugs, weapons, or so on, from entering the prison, that that defeats the argument that there is an obvious easy alternative that fully accommodates the right. Well, the record doesn't really show that this is a terribly effective means except to prevent books coming in at all. Now, you have a policy for clothing and hot pots and that kind of thing that they're examined, opened, x-rayed, but it doesn't have to have any of this hokey labeled stuff. That is correct. And the reason that prison officials treat those items differently than written items is because incoming mail, written mail, periodicals, books, and so on, has proven distinctly problematic in the prison context. There are encrypted messages in books, perhaps, if there's a lengthy book sent in to a prison. Well, but the means should be to get it to come from the publisher. And there would be means which could get it to come from the publisher that would allow the publisher to send the books. Is that right? That would be the purpose of the policy. I think, and I want to be clear about this, in most cases, incoming books that were sent from non-vendors will be discovered and sent back, maybe even 95, maybe even 98 percent of the cases. What I'm concerned about is that extra 2, 5, 10 percent in which they are not discovered. Of those, that is where it is reasonable for the prison to enact a second additional regulation to create a second mechanism to catch those items that weren't initially caught, even though they should have been. And that is ultimately, I think, where the district court got it wrong. Because the district court held that the reasonable, legitimate, I'm sorry, the legitimate penological interest was defeated because it was the regulation in this case was duplicative of the mail search. And it's my position that simply because the regulation is additional to other security precautions does not mean that it's duplicative, and it certainly doesn't mean that it's unreasonable. Well, as applied, if we accept the record the way it is now, the books won't come at all. It would my response to that is that at the outset, four declarations by four individuals where there is no record that they even followed up with the book vendors to have, to see if they could rectify the situation that way, does not establish that this is a de facto prohibition. Well, there's no evidence on the other side. You didn't put anything in that shows, you know, some prisoners receive books under this policy. Now, what we did is we showed that this policy is related to penological security needs. And no, no, we're not talking about that. I think that's correct. It is related, but we're talking about whether, you know, it's overbroad because it's an absolute prohibition. That's what you really have to address. I have two responses to that. At the outset, under the Supreme Court's decision in Alone v. The State of Shabazz, which is cited in both briefs, even if there is no alternative means of exercising the right, in this case I would take the position there is because there's a law library and so on, but even if that were the case, the legitimate penological interest would still stand, because in that case, the Alone case, the plaintiffs wanted to go to Juma services and couldn't because of security restrictions on their movements. But here, you know, there are, you know, there could be other alternatives other than the absolute prohibition. Maybe in Alone, you know, there wasn't, right? There could always be other alternatives that would be proposed, although generally it's the plaintiff's burden to propose those alternatives under Turner. Notwithstanding that, the ultimate standard is whether the existing regulation is reasonably related to the legitimate penological interest. Whether there are other alternatives is only one of four factors under Turner. Now, I admit that it is something that the Supreme Court said that the Court should consider, but the language in Alone was very clear. Well, speaking for the State of California, do you want to deprive prisoners of books? No, I don't. Certainly not. I only want to ensure that they get those books from sources that have proven to not be inclined to send contraband into prison. And to that end, it's important to make a policy like this, some sort of policy, that makes it as crystal clear as possible for the correctional staff working in the mailroom to determine whether a book was sent from a vendor or a non-vendor. Because if there is a bright-line rule that they can follow, it has a form or it doesn't have a form, then the nonexistence of that form, the non-appearance of that form will alert them. You know, no matter how many other packages there are, no matter how long they've been doing this all day, you know, it will alert them to the fact that this is a problem and this is probably something that was sent from a non-vendor. Mr. Walden, your – excuse me. Did you complete your answer? I have completed my answer, Your Honor. Your Honor, the reason it took so long, to my understanding, was to demonstrate that even if no books came in as a result of this policy, that would justify it because it's a rational step for them to penalize crime. From my understanding, that's my – that's my – yes. Now, putting aside the fact that a loan deals with a far more dramatic set of security problems, I'm not sure where that logic of a loan carries you because it seems to me you could be making the same argument if one has decided – if the policy here is not simply a policy that's actually challenging, but a policy which said that it's risky to have books come in, so we're not going to – we're not going to have books or magazines or newspapers. That's the securest thing we can do. But I don't think the State of California would pursue that. Well, they haven't. They haven't. Right. But wouldn't the loan need to justify – the magnitude, according to the loan, need to be defending exactly that policy? Well, I think in that scenario, clearly, a loan would be stretched well beyond than it's ever been applied. And in that scenario, I think the fourth-turner factor would carry much more weight than it should in this case because the argument that there are other alternatives that accommodate at least some First Amendment right would be much stronger. Then we have to return to the question of how much rationality there is in going beyond essentially the Bell and Wolffish standard to the far more restrictive standard that's involved here. And it seems to me we have a district court saying the new, this more rigorous standard doesn't accomplish anything. The State hasn't come forward with anything except sergeants, whoever it was, saying, gee, there was an incident where somebody pushed some drugs through, but there were no details. Well, I want to respond to two things you said, and I can tie them into one here because the preface that you introduced your question with was that the security concerns on the loan were more substantial than they are here. And then also you mentioned the declaration of sergeants. I believe it was Rodham. And I want to address that point because incoming periodicals have presented a very substantial risk to security in prisons, particularly in the context of a security housing like this, where if you're there, you're there because you're either a prison gang member or you're so dangerous that prison officials have no alternative. And in those scenarios, particularly with encrypted messages, what particularly prison gangs will do is hide messages on page 347 of a very long book towards the margins that are difficult to discover, and it will be a hit list, and it will carry some consequence. So I think that these are very substantial security restrictions, and that's why this policy is important to the State. Well, nobody faults a policy that the books have got to come from the publisher. It's just that the rule that you have is one which apparently prevents any books or publications coming. So something the State ought to be smart enough to allow things coming directly from the publisher without requiring this particular form of restriction. I see your concern. But at the outset, under seal of text, it's the plaintiff's burden to approve his case in a summary judgment motion if he's asking for a permanent injunction. And so it's his burden to establish that this policy is a de facto prohibition of incoming publications. Well, he's shown that. Well, he submitted the four declarations, and I would not concede. And all you have submitted is one sergeant saying once some drugs came in, and we don't even know whether it came in in books or whether it came in in tennis shoes. It said that those drugs came in notwithstanding the fluoroscope, because the issue that it was addressing when the declaration said that is that fluoroscopes generally detect drugs, but this time they didn't. I think the concern that is even more substantial than that, however, is the fact that nothing can discover encrypted messages, not an X-ray machine, not a fluoroscope, nothing except for the human eye. And that's what makes this a reasonable policy, because going back to taking the constitutionality of the publisher's only rule, as I think we have to because of Bell v. Woolfish and the fact that plaintiff is challenging that, this is an effective way, a reasonable way to create a bright-line rule for congressional offices. It's certainly effective. No books. Let me. There's a library. I still don't. Mr. Walsh, help me out here. I still don't understand what this requirement to attach an approved label, what that furthers as opposed to the policy that books can only be received from approved mail-order vendors. How is the book label furthering the policy? It's furthering the policy because incoming packages from various book vendors, whether they're Amazon.com or the mom-and-pop set up on Turk and Larkin, will look very different. And maybe the Amazon.com books have a much more general appearance, but the smaller book vendors don't have that appearance. And so what correctional officers who work in the mailroom and are looking at these packages see are all sorts of different packages coming from all sorts of different types of vendors. Well, the policy said books have to come from an approved mail-order vendor. Right. So is there a list of approved vendors? I believe there is. Well, doesn't that make it pretty easy to tell whether it's coming from an approved vendor or not? No, because it's not a short list. It's not a list that is just Barnes & Nobles and Amazon.com. It's a long list. It's not in the record, but it's not a short list. I'm down to two minutes. Unless this Court has any questions. I think you should save your time. Thank you. Me again. Good morning. May it please the Court. Just to reiterate, we of course are not challenging a very good rule that they can only come from vendors. Sound policy, we would not dispute it a bit. The rule, by the way, is not a publisher only. It just means a vendor. So, for example, Barnes & Noble, Amazon, what have you. And I am not aware of any type of list. The vendor can be any kind of what I would describe as a real book vendor. And unfortunately, the book vendors just can't be bothered with these blue labels. I'm hoping in the record, I think we actually did have one of the labels. And there's just, you have to imagine, you know, the Barnes & Noble shipping and receiving area, which is probably about five acres in size with all kinds of conveyor belts, they've got to stop it all to, you know, cut this label, tape it on there, sign it, and ship it out. And, you know, it just happens that they don't want to do it. They'd rather not have that business, right? They don't care, right. And it's kind of sad, but, you know, what can a prisoner do? And I don't think the prison really intended that. That's just sort of a happenstance result. It's just something that happened. And I also would like to say, Mr. Asher is a highly energetic person, highly resourceful, and it is not from lack of trying that he hasn't been able to get these books. He's the kind of person that really tries to do it. He's a vociferous reader when he can have the books. He wants to read them. And unfortunately, now he can't. And as of the date of the summary judgment, it had been several years since he had had a book. It's kind of a, you know, it's just one of those things. I would also like to point out that this is a rule specific to Pelican Bay. And they have other security housing units in the State. There's one at Folsom. There's one at Corcoran. I think there may be others. And they don't have this rule. They have a vendor-only rule, for obvious reasons. They don't have this added, I call it the blue label rule, just because the label is blue. I'd also like to point out the kind of fervor that the warden has to protect this rule, for whatever reason. It is so much that the warden has decided to just openly disobey the Court's injunction. This rule has absolutely not been stopped. The Court enjoined it, but it still goes. And we'll have to deal with that. That's happened. It happened post. No. I'm just kind of telling you that to let you understand the attitude up there. It's post-judgment activity. Well, I don't know. I'd just like to let you know that. I realize my procedure is to go back there to do a motion to enforce it. And we will do that. I think anyway, I just think it's kind of odd that the warden is sort of violating the law as far as I'm concerned. And it's just sort of odd. Anyway, we'd like to say also that there has never been any documented case of some kind of paraphernalia coming in in a book from a vendor. You know, you'd have to have your buddy working at Barnes & Noble or something. And although theoretically that could happen, it just hasn't happened. And I think they have a valid concern to look out for stuff, but it just hasn't happened yet. Also, they get a look at the books no matter what, whether, you know, however they come in, vendor with label or vendor with no label. I think our main point. Well, but it's a question of how much time, you know, the mailroom personnel have to spend, you know, inspecting these packages, right, with or without the label. I don't think there's any question that it would make life simpler for the mailroom, right? I'll tell you what. We respect the fact that the mailroom people down there have a big job to look at everything that comes in. You know, there's all kinds of letters coming in. And it's a big job. And I don't want to add to that job. I don't want to make it so they miss one. The problem here, though, is that they unfortunately, they just sort of preclude them all. And it's, you know, it's a good program now because they just can't get in at all. And we wouldn't mind it, just so you know, if it meant we've got to do a little more work to get a book in. Well, that's okay. We'll do a little more work. And I agree with Mr. Walston. You can't complain that it is, quote, inconvenient or a hassle. That's fine. If the book vendors would do it, we would just keep up with it. And we would send the books out there and, you know, give them that blue label. And if they would put it on, I think we would probably not even have this case. In other words, if the booksellers would apply the book label and send the books in, then, you know, my client would just put up with it and deal with it, which is, I'm sure, the proper way to do it. Unfortunately here, we just can't do it. And the question that you'll have to resolve is, you know, whether there's sort of a common sense or whether this doesn't make common sense below. And I think the Court did, by the way, as you know, they're making a big issue about whether the proper standard was applied. And I thought it was abundantly clear from the Court's order that she applied the proper test, went through it very carefully, element by element, and found that it didn't make common sense, there was no rational relationship. The transcript of the summary judgment proceeding, the Court asked the attorney representative, it was not the same counsels on appeal, but, you know, what is a scenario under which this could really help things? And I think the biggest issue is they might be concerned about somebody doctoring up a book vendor label. So you could, for example, you could put a return envelope Barnes & Noble. And I think if you went to a stationery store for $100, you could probably buy that. And you could mail in something with a Barnes & Noble return on it, and the people that are running the mailroom might not detect that it is some kind of a fraud. And the only thing I'll say to that is, yeah, people can do that. I mean, people are endlessly inventive in these environments. So I respect the prison's issues about that. But one of the things the district court found is that, well, that same person that's going to make a fake Barnes & Noble return address could just as quickly print up this label, which could be done on a word processor, just print it out on blue paper. So what's the difference? And it really kind of gets down to that. It's sort of like either way, they've got some issues there. They cannot, I think, just outright prohibit books into the prison. I find that the comparison alone, one of the big differences there is they were allowed to prohibit one type of religious ceremony, but they still haven't prohibited people, for example, from being a Muslim in prison. It's not the whole kit and caboodle, in other words. It's just a part of it. Pretty big kit and caboodle in alone, wasn't it? It seems like it is. It was stopping the group of Muslims from assembling together in religious activity that was regarded, as I recall it by the testimony, as central to the religious enterprise. I would agree. I'm really surprised at that decision, but that's what it is. And I would agree with you 100 percent. It's a big thing there. But it doesn't say you can't be a Muslim. You know, you can still do what you need to do at whatever time you're able to do it in your cell and whatnot. So there's still you are still allowed to, you know, be a Muslim in jail, that's  And here you may be excluded altogether having a book. They also express this notion that – I'm sorry. There were two other recently published Ninth Circuit cases that talk about just bans. And I cited them. One of them had to do with free books. Some publishers are sending out free stuff. And there was a case where they ruled that, oh, no, you can't get a free book. And that was just seen as why not, you know. And they decided, no, you can't do that. And we think we're in kind of that category, where there's just – where there's a regulation that causes an outright ban of books. That's where they cross the line. And that's really where we think we are right now. I realize I have more time left, but to tell you the truth, I really don't have anything else to tell you about, unless you have some questions. No, it's fine. I wish I could borrow this time on my other case, but I guess I can't. Thank you. Thank you, Mr. Frank. I'll just sum up by saying this. This is – this policy is not just a policy to make life simpler or more expeditious for the custody staff who works in the mailroom. And it is not eliminating the books in prison altogether. It's not? What's the evidence in the record that shows that? Well, nobody disputes that at the outset, there's a law library. And in the law library, which is codified, actually, in Title 15 of the California Code of Regulations, inmates get all sorts of books. So there's not this ban on books in prison. And that much is clear. Are you saying the inmates order books for the law library? Is that what you're telling me? I'm saying they can get books from the law library, yes. Law books. Or not – I just said law library, but I meant to say just library. And this is – so it's not eliminating. There's evidence in the record about the availability of new books of all kinds in the apartment? The only evidence in the record, other than the things the Court can take judicial notice of, which is in the California Code of Regulations, is the four declarations by the – I think there were three inmates and one non-inmate who tried to get books on one occasion and who didn't. That's what's in the record. I thought you were offering us an availability of books that could be gotten through the prison library. There are books. I didn't know what there is in the record on that. That is – it's never been disputed, but it's in Title 15 of the California Code of Regulations. And so it would be my – and so although it's not in the record, I think the Court could take judicial notice of that. But these are law books, not Seabiscuit or – It's whatever's in the – I've been in several prison – I keep saying law library, but I mean library. I've been in several of them. You know, what you would expect to find is there Mark Twain, things like that. You know, the very mainstream books. But just to sum up, this is not something that's just to make life simpler for custody staff. This is to provide a bright-line rule for them to follow and easily identify suspect books versus non-suspect books. Thank you, Your Honors. All right. Thank you, Mr. Walton. Thank you, Mr. Frank. This case is submitted for decision. Last case on today's calendar, so the Court will stand in recess for the day. Court is in recess. Thank you. Thank you. Thank you. I don't know what that means. I don't know what that means. I don't know what that means. I don't know what that means. I don't know what that means. I don't know what that means. Great. Yeah. Let's wait until the next check. If you got any – I'll find it on my cell phone. I'll find it on my cell phone. Okay, great. Thanks. Okay. Do you have a point? No. Oh, lock it. Oh, I see. Do the chamber. Do the chamber. Okay. Okay. And then, you third hand. We don't need an order. He doesn't want an order. Right. So we reset the timer. How do I turn it on? Just turn it on. Okay. So that's the way you turn it on.      We don't need it. We don't need it. We don't need it. We don't need it. We don't need it. We don't need it. So you have to look at the time. It's this second. Oh, yeah. Okay. When he said he was ...  When you say it was five, you say what am I reading?  Yes, it was the same as what you said earlier. Okay.   Okay.
judges: B Fletcher, Tashima, Pollak